UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GREGORY NIEMAN,

                Petitioner,                Case Number 21-10299
                                            Honorable David M. Lawson

v.

BECKY CARL,

                Respondent.
_____/

**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

A Michigan jury convicted petitioner Gregory Nieman of first-degree murder in the strangulation death of his 88-year-old father.   He challenges that conviction and his life-without-parole prison sentence in a petition for a writ of habeas corpus under 28 U.S.C. § 2254.   He raises a number of grounds, but his main contention is that the state courts mishandled his demands for legal representation when the trial judge refused to appoint a fifth attorney after he tried to "fire" the fourth one.   As a result, Nieman represented himself on the last two days of his five-day trial, with the help of standby counsel.   He says his right to counsel under the Sixth Amendment was abridged.   The state courts rejected that claim and Nieman's other arguments.   Those decisions reasonably applied and did not contravene federal law as determined by the Supreme Court.   The petition will be denied.

I.

The facts of the case and the procedures were summarized in detail by the Michigan Court of Appeals in its opinion on direct appeal.   *People v. Nieman*, No. 339517, 2019 WL 1746211, *1-5 (Mich. Ct. App. April 18, 2019).   The petitioner had been the guardian, conservator, and live-in caregiver for his elderly father, Donald Nieman, for about a year and a half when, on

December 27, 2015, he says he found him dead in his bedroom. A medical examiner concluded after an autopsy that Donald died by manual strangulation. *Id.* at *1. Neighbors had heard the petitioner and his father argue occasionally and heard evidence of physical abuse. When the police came to the house on the morning of the death report, it appeared that Donald had died much earlier. *Ibid.* The petitioner was the only other occupant of the home. There was no evidence of an intruder or a visitor. The police saw that the petitioner's right hand was swollen and there was other evidence of injury on his forearm. The petitioner tried to explain that the injury resulted from a fall, but the medical experts undermined that cause of death. There was evidence that the petitioner had a financial motive to do away with his father, who may have presented an obstacle to the development of real estate that Donald owned. *Id.* at *10.

From the outset, Nieman's relationships with his court-appointed attorneys were fraught. The court of appeals thoroughly documented the history of Nieman's legal representation from the appointment of his first attorney on January 4, 2016 through the conclusion of the trial on May 24, 2017. *Id.* at *1-5. Throughout, Nieman was confrontational with his attorneys, abusive during their meetings, accusatory about their ethics and honesty, and difficult to represent. Nieman's first attorney, Steven Kaplan, asked to withdraw after about six months, on June 13, 2016, citing a breakdown in their relationship. *Id.* at *1. The trial court appointed attorney Michael Dennis on June 17, 2016. At a hearing on November 7, 2017, Dennis informed the court of discovery delays, but he remarked that Nieman's treatment of him had been "untenable," and that their meetings devolved into a "shouting match." *Ibid.* They had a dispute over the retention of a defense medical examiner expert, and Nieman insisted on asking for an order to exhume his father's body. He identified an attorney that he wanted the court to appoint to represent him, but the court told him that he did not have to right to choose a lawyer unless he hired one at his own

expense.   At a hearing on November 21, 2016, after the discovery dispute had been resolved, Nieman told the court that he was "firing" Dennis.   At that point, the court warned Nieman, "you're getting who you get and I'm done.   You've got to figure out how to hire your own if you want to pick your own. . . . You're going to take who ever is next on the list.   And, this is your third one.   So, you get no more."   *Id.* at *2.

A third attorney, R. Timothy Kohler, was appointed the next day to represent Nieman. That didn't last, as Kohler had a conflict, and the fourth lawyer, Joseph Kosmala, was appointed on December 16, 2016.   *Ibid.*

Nieman and Kosmala clashed over the retention of a pathologist (Nieman insisted on someone from the University of Michigan, but University policy prohibited private consults) and Kosmala expressed his frustration to the court at a hearing in March 2017.   At that point, Nieman declared, "He lies, first of all.   I don't want him as my attorney."   Even after the court interrupted him, stating, "You've said this about every single attorney.   I'm not going there," Neiman would not desist.   *Id.* at *3.   The court warned him again that if he wanted to choose his lawyer, he would have to pay for it.   When Nieman continued his rant, interrupting the court, he was removed from the courtroom, and the court scheduled the next hearing date.   *Ibid.*

Meanwhile, Kosmala found a pathologist who had a remote connection with the University of Michigan.   His autopsy review was ongoing at the time of the next pretrial hearing in April 2017.   But Neiman was not satisfied and continued to criticize Kosmala's work.   He expressed dismay that the deceased's body had not been embalmed despite his instructions to the funeral home, which affected the utility of an exhumation.   He was not consoled when the court reminded him that certain vital organs had been removed and preserved and could be examined. He complained generally about "lying here, corruption, falsifying documents, making statements that

are not true." *Ibid.*   He asserted that "red flags are going everywhere" and that his "case needs to be looked into." *Ibid.*   And then Neiman asserted, "I don't want this man as my attorney," and the court again warned him that no new attorney would be appointed. *Ibid.*

Trial was to begin on May 17, 2017.   However, Nieman came to court in a jail uniform because he refused to put on the suit that the court had furnished. *Ibid.*   He complained again about Kosmala as his attorney, he asked for a delay to bring in witnesses who he believed would say that his father was prone to falling and bruising, and he expressed anger that the retained pathologist's findings corresponded with the state's expert and did not support an exhumation request. *Ibid.*   He eventually had to be removed from the courtroom "when the interaction became too heated." *Id.* at *4.   After the break, Nieman returned to the courtroom and said that his family would retain a lawyer.   The court told him that would be allowed anytime during the trial, but he would have to proceed at that time with attorney Kosmala or represent himself with Kosmala as standby counsel. *Ibid.*

Trial began the next day.   The court of appeals paints a detailed picture of the petitioner's disturbing conduct and the trial court's responses:

> Ultimately, defendant admitted that he could not control himself in front of the jury and he was removed from the courtroom during jury selection.   Kosmala continued to represent defendant as all agreed defendant had not made a knowing and voluntary waiver of his right to appointed counsel.   The court arranged for a video feed in the holding cell but defendant refused to even watch the proceedings.   And before voir dire, Kosmala advised the venire that defendant had a right to choose to be present and that he elected not to come into the courtroom.
>
> After an hour of voir dire and an hour lunchbreak, the court brought defendant back into the courtroom.   Defendant again stated his intent to retain his own attorney.   Although defendant did not want Kosmala to select his jury as "[t]his whole thing smells of corruption," he also did not want to be present in the courtroom.   Defendant was again removed, the jury venire returned, and voir dire continued.   By the end of the day, a jury had been empaneled.
>
> On the second day of trial, which was a Thursday, Kosmala reported that Robert Kirk, the attorney handling Donald's probate case, contacted each of defendant's siblings, who

indicated that they would not assist in securing private counsel for defendant.   The siblings had given Kirk a garbage bag filled with defendant's clothes that needed to be cleaned before they could be worn in court.   The dry cleaner could not complete the job until that weekend. Defendant challenged this description, claiming that his sister told him the night before that she was trying to retain new counsel for him.   He refused to wear court-provided clothing until his own clothes were ready.   And defendant continued his complaints about Kosmala's performance and the corruptness of Macomb County government.

Defendant again stated that Kosmala was "fired" and asked the court to appoint substitute counsel.   The court reminded defendant, "We've gone through this."   She offered defendant three options: represent himself with Kosmala as advisory counsel, allow Kosmala to handle the defense, or hire his own attorney.   Defendant descended into disruptive behavior, ranting and "roaming around the courtroom."   He refused to stay in the courtroom for trial, and refused to watch the trial via closed-circuit television.   After 20 pages of transcript filled with this behavior, the bailiff escorted defendant out of the courtroom.   Before the jury was brought in, the court noted that defendant was "being relatively loud" and could be heard in the courtroom.   Accordingly, defendant was removed to a lower floor in the building.

On Friday, March 19, the third day of trial, defendant complained about attorney Kirk and reiterated that he would only stay in the courtroom if he could wear his own clothes.   He reiterated his complaints about Kosmala as well.   After 19 pages of transcript, defendant was removed from the courtroom again.   The trial continued and the prosecutor closed the state's case-in-chief.

On the fourth day of trial, defendant appeared in the courtroom in his own clothes.   He indicated his intent to testify and said he understood that he would have to follow the question and answer format.   Before the jury was brought in, defendant complained that he had fired Kosmala but that the court "hired him back."   Defendant also returned to his complaints that he was denied the right to be present in the courtroom because he would not wear court-provided clothing.   He returned to themes of corruption and fraud.   He accused Kosmala of failing to contact the witnesses he suggested.   Kosmala responded that he would not call the witnesses to the stand because their testimony would be irrelevant and because it would be against his "ethical obligation to this court" and his "professional responsibility" as the defenses would "be improper."   Defendant exploded into a rage and ultimately declared that he would represent himself so he could call and question his witnesses.   The court advised that it would allow defendant to call his siblings who were in the courthouse, but not the other witnesses who were never identified with specificity (a female teller at Donald's bank and an employee of his local Walgreen's pharmacy).

After more complaints from defendant, the court stated, "I'll allow him to call Randy Nieman and rebuttal witnesses.   Have a seat.   Mr. Kosmala, you are now advisory counsel."   The court warned defendant, "[Y]ou need to not be disruptive and follow the Court Rules."   The prosecutor was concerned that the record was inadequate and asked defendant a short series of questions regarding his education and understanding of the legal process.   Defendant was again advised that even representing himself, his right to present witnesses would be limited

to the list approved by the court. Although he continued to express his displeasure, defendant stated, "Yes I'm going to represent myself."

Defendant called his brothers Randy, Tom, and Donald, Jr. to the stand. He called his brother-in-law, Michael Wilson, and family friend, Pamela Terry. Defendant wished to call his father's friend, Alvin Kukuk to testify, but Kukuk recently had passed away. Defendant then took the stand in his own defense. There were several long-winded arguments after defendant violated the court rules or the rules of evidence and multiple breaks for the jury so defendant could be admonished. The court then ordered defendant to provide an outline of the remainder of his narrative testimony. Defendant refused and the court ruled that defendant would not be permitted to testify further.

On the fifth and final day of the jury trial, defendant stated his intent to continue representing himself. The court allowed defendant 20 minutes with Kosmala to prepare his closing argument. During his statement, defendant engaged in an argument with the prosecutor and asserted that he was uninformed about the facts elicited during the case-in-chief because he did not want to come into the courtroom "looking like a hobo." The court reminded defendant on several occasions that the closing argument was not an additional opportunity to testify and that he had to stick to the facts brought out at trial. The court allowed defendant to speak for nearly an hour and then excused the jury from the courtroom. The court admonished defendant for improper behavior during his argument and defendant again launched into a diatribe about corruption in Macomb County. Defendant remained agitated and the court feared he would improperly interrupt the prosecutor's rebuttal argument. Accordingly, the court had defendant removed from the courtroom. After a 10-minute break, defendant promised to remain quiet and was allowed to return.

During jury instructions, defendant again interrupted the court and tried to "correct" issues of fact. The court dismissed the jury and repeatedly ordered defendant to "stop talking." The court removed defendant again before the alternative jurors were selected and dismissed from deliberation.

*Id.* at *4-5.

The jury found the defendant guilty of both first-degree premeditated murder and first-degree felony murder. He was sentenced to life in prison without the possibility of parole on each count.

Neiman filed a direct appeal, raising claims concerning the trial court's denial of substitute counsel and his subsequent self-representation, the conduct of the prosecutor, double jeopardy, and the sufficiency of the evidence. The court of appeals granted relief on the double jeopardy claim by vacating one conviction and declaring guilt on a single count of first-degree murder under

two theories.  It denied relief on the other claims and remanded the case to the trial court for correction of the judgment of sentence.  *Nieman*, 2019 WL 1746211 at *11.  The Michigan Supreme Court denied Nieman's application for leave to appeal.  *People v. Nieman*, 504 Mich. 998, 934 N.W.2d 251 (2019) (mem.).

Neiman's habeas corpus petition filed in this Court raises the following grounds for relief:

I.      The trial court's refusal, at trial, to grant his request for appointment of other counsel, which ultimately led to the petitioner involuntarily representing himself, was a violation of his Sixth Amendment right to the assistance of counsel and to due process and a fair trial.

II.     He was denied a fair and impartial trial as a result of prosecutorial misconduct in making multiple expressions of personal opinion of guilt in front of the jury.

III.    His convictions of both first-degree premeditated murder and first-degree felony murder violate Double Jeopardy protections.

IV.     The prosecution failed to present sufficient evidence to support his first-degree murder conviction.

V.      Perjured testimony from his court-appointed trial attorney and his court-appointed appellate attorney would not appeal this ground.

Pet. at 5, 7, 8, 10, ECF No. 1, PageID.5, 7, 8, 10.

The respondent opposes the petition on the merits and also contends that the last claim is unexhausted.  It is true that a habeas petitioner must "exhaust" all available state remedies for each of the claims in the petition by "[f]airly present[ing] . . . [to all levels of] the state courts . . . both the factual and legal basis" for the habeas claims.  *Nian v. Warden, N. Cent. Corr. Inst*., 994 F.3d 746, 751 (6th Cir. 2021) (quoting *Wagner v. Smith*, 581 F.3d 410, 414-15 (6th Cir. 2009)); *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000); *see also* 28 U.S.C. § 2254(b)(1).  And when a habeas petitioner fails to raise a claim in the state appellate courts, and "at the time of the

federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted." *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006) (citing *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982); *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991)); *see also O'Sullivan v. Boerckel*, 526 U.S. 838, 847-48 (1999).   The "procedural default" argument is a reference to the rule that the petitioner did not preserve properly some of his claims in state court, and the state court's ruling — or nonruling — on that basis is an adequate and independent ground for the denial of relief. *Coleman*, 501 U.S. at 750.   But the Court finds it unnecessary to address the procedural question, because it is not a jurisdictional bar to review of the merits, *Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005), and "federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits," *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)).   The procedural defense will not affect the outcome of this case, and it is more efficient to proceed directly to the merits.

## II.

Certain provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering an application for a writ of habeas corpus raising constitutional claims, including claims of ineffective assistance of counsel. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003).   The AEDPA provides a "highly deferential standard for evaluating state-court rulings[.]" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).   That means federal courts give the state court "the benefit of the doubt," *ibid.*, applying that "statutorily

prescribed deference," *Michael v. Butts*, 59 F.4th 219, 225 (6th Cir. 2023) (citing 28 U.S.C. § 2254(d); *English v. Berghuis*, 900 F.3d 804, 811 (6th Cir. 2018)).

A federal court may grant relief only if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). "Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the *dicta*, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quotation marks and citations omitted). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). The distinction between mere error and an objectively unreasonable application of Supreme Court precedent creates a substantially higher threshold for obtaining relief than *de novo* review. Mere error by the state court will not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520-21 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000) (quotation marks omitted)).

## A.

Nieman's first claim comprises two separate issues under the Sixth Amendment: whether the trial court violated his constitutional rights by denying his request to appoint another lawyer to represent him (it would have been his fifth); and whether he was deprived of legal representation

involuntarily when he ended up representing himself during the last two days of the trial.   Each argument will be addressed in turn.

1.

Nieman contends that the trial judge should have appointed an attorney to replace Joseph Kosmala because of a disagreement over a defense theory on the cause of death, Kosmala's failure to call witnesses to support that theory, and his failure to persuade the trial court that the deceased's body should have been exhumed and examined.   He also said that Kosmala did nothing to prepare for trial and that their relationship had broken down.   The Michigan Court of Appeals rejected these arguments.   First, setting the stage by describing Neiman's general hostility to his previous lawyers and accusing him of trying to "game the trial system," *Nieman*, 2019 WL 1746211 at *6, the court found that his insistence on asserting a defense that his "own experts rejected" (that the death-causing injuries resulted from a fall) and Kosmala's refusal to call witnesses to support it "did not amount to good cause warranting substitution of counsel," *ibid.*   The court cataloged Kosmala's trial preparation activities and concluded that the "allegation that Kosmala failed to investigate and prepare is not supported by the record and did not amount to good cause warranting substitution of counsel."   *Ibid.*   The court then rejected the "breakdown" argument, attributing the discord to Nieman alone.   *Id.* at *7 ("[D]efendant's constant complaints about all his attorneys reflected that he could not, or would not, maintain a working relationship with any attorney. Defendant could not avoid trial indefinitely with such antics.").

Neither the Constitution nor the laws of the United States would have compelled a different holding.   The Sixth Amendment includes an "implicit" guarantee that a defendant may hire an attorney of his own choosing.   *Linton v. Perini*, 656 F.2d 207, 208 (6th Cir. 1981).   But "[t]he

- 10 -

right to the assistance of counsel at trial does not guarantee that a criminal defendant will be represented by a particular attorney" whom he does not retain himself. *Serra v. Mich. Dep't of Corrs.*, 4 F.3d 1348, 1351 (6th Cir. 1993); *see also Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989) (holding that "impecunious defendants [do not] have a Sixth Amendment right to choose their counsel" and "have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts."). Simply stated, "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 151 (2006).

There are times when a trial judge should appoint a different attorney for a defendant. Keep in mind, though, that "the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat v. United States*, 486 U.S. 153, 159 (1988). A defendant who wants a different lawyer therefore must "show good cause such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict with his attorney in order to warrant substitution" of counsel. *Wilson v. Mintzes*, 761 F.2d 275, 280 (6th Cir. 1985); *accord Henness v. Bagley*, 644 F.3d 308, 321 (6th Cir. 2011). A trial court's denial of a request to substitute counsel is evaluated against the following factors:

> (1) the timeliness of the motion, (2) the adequacy of the court's inquiry into the matter, (3) the extent of the conflict between the attorney and client and whether it was so great that it resulted in a total lack of communication preventing an adequate defense, and (4) the balancing of these factors with the public's interest in the prompt and efficient administration of justice.

*Henness*, 644 F.3d at 321 (quoting *United States v. Vasquez*, 560 F.3d 461, 466 (6th Cir. 2009)).

These factors do not favor Nieman's arguments.   The first factor, the timeliness of the requests for his fifth court-appointed attorney were made less than two months before trial, one month before trial, and again on the day of trial.   *See United States v. Trujillo*, 376 F.3d 593, 606-07 (6th Cir. 2004) (request for substitute counsel made three days before trial was untimely); *United States v. Chambers*, 441 F.3d 438, 447 (6th Cir. 2006) (request for substitute counsel made one and a half months before trial was untimely).   Eleventh-hour requests must be viewed with caution.   A court must beware that a demand for substitute counsel "may be utilized as a way to delay proceedings or trifle with the court."   *United States v. Krzyske*, 836 F.2d 1013, 1017 (6th Cir. 1988).   The second factor, the adequacy of the trial court's inquiry, weighs against Nieman because the trial court allowed him to explain his concerns about counsel's representation.   The court also heard from counsel on the matter.   *See*, *e.g.*, Pretrial Hr'g. (March 28, 2017), ECF No. 14-17, PageID.490-96; Pretrial Hr'g. Tr. (April 1, 2017), ECF No. 14-18, PageID.509-13; Trial Tr. (May 17, 2017), ECF No. 14-19, PageID.523-62.   Nieman cannot prevail on the third factor, the extent of the conflict or breakdown in communication, because the record does not show that any conflict was significant enough to justify a substitution.   Any disagreement over the relevancy and value of certain pretrial actions and potential witnesses reflects a difference of opinion on trial strategy, not a breakdown in the relationship or a total lack of communication.   *See Adams v. Smith*, 280 F. Supp. 2d 704, 720 (E.D. Mich. 2003).   Moreover, the record reveals that Kosmala consulted with Nieman about his defense and was well-prepared for trial.   *See*, *e.g.*, Trial Tr. (May 17, 2017), ECF No, 14-19, PageID.529-32; *see also Nieman*, 2019 WL 1746211 at *6 (describing counsel's work as outlined in his motion for extraordinary attorney fees).   The court of appeals reasonably determined that Nieman and counsel were able to communicate and work together to

present a defense at trial.   Nieman was willing to confer with Kosmala and they consulted during the phase of the trial when Nieman represented himself.   *See*, *e.g.*, Trial Tr. (May 24, 2017), ECF No. 14-23, PageID.1361, 1368-70.   Lastly, the public's interest in the prompt and efficient administration of justice weighs against Nieman because the substitution of counsel would have further delayed the proceedings and resulted in additional costs to the parties and the court.

Nieman has not shown that the state court's denial of relief on this issue contravened or misapplied federal constitutional law.

## 2.

After the trial court's final refusal to replace Kosmala as Nieman's lawyer, Nieman chose to represent himself.   He did not want to do that, but he apparently decided that he would rather go it alone than with his court-appointed lawyer.   He contends that as a result, he was deprived of the right to counsel that the Sixth Amendment guarantees.

The Michigan Court of Appeals observed that the trial court did not comply strictly with the state's procedures for taking a waiver of the right to counsel.   *Nieman*, 2019 WL 1746211 at *7.   The court held that the error didn't matter, though, because it found that Nieman "waived or forfeited his right to counsel."   *Ibid.*   The court explained that "willful conduct by a defendant that results in the absence of defense counsel constitutes a forfeiture of the right to counsel."   *Ibid.* (citing *People v. Kammeraad*, 307 Mich. App. 98, 131, 858 N.W.2d 490, 510 (2014)).   The court held that the defective advice on waiver of counsel was inconsequential because "when a defendant forfeits the right to counsel, the court is not required to determine whether the defendant knowingly, understandingly, and voluntarily gave up his right."   *Ibid*.   The court found that Nieman's antics before and during trial fell comfortably within that rubric.   *Id.* at *8.

- 13 -

Criminal defendants have the right to counsel, U.S. Const. amend. VI, and also have the right to represent themselves, *Faretta v. California*, 422 U.S. 806, 819 (1975). However, before proceeding without an attorney, the defendant generally must be aware of the risks of self-representation so that "he knows what he is doing and his choice is made with eyes open." *Faretta*, 422 U.S. at 835. The advice from the court should include the nature of the charges, included offenses, the range of allowable punishments, possible defenses, and mitigating circumstances. *See Glass v. Pineda*, 635 F. App'x 207, 214 (6th Cir. 2015) (citing *Von Moltke v. Gillies*, 332 U.S. 708, 724 (1948)).

The Michigan Court of Appeals found that, although the trial court did not follow prescribed procedures, Nieman "was well aware of the charges and that he faced a life sentence." *Nieman*, 2019 WL 1746211 at *7. That factual conclusion is supported by the record. Moreover, the lack of formal warnings does not mean that the petitioner did not embark upon self-representation with his eyes open. *See Swiger v. Brown*, 86 F. App'x 877, 881-82 (6th Cir. 2004) (finding a valid waiver of counsel, despite the lack of formal warnings, where the trial court refused to appoint private legal counsel and the indigent petitioner proceeded unrepresented rather than with a public defender). "[T]he 'ultimate test' of whether a defendant's choice is knowing is not the adequacy of the trial court's warning but 'the defendant's understanding.'" *Jones v. Walker*, 540 F.3d 1277, 1293 (11th Cir. 2008) (citing cases). Moreover, the Supreme Court has never held that the absence of formal warnings in and of itself requires reversal of a conviction or habeas relief where the record otherwise indicates that the defendant understood his or her rights and made a knowing waiver of the right to counsel. *See, e.g.*, *Carruthers v. Mays*, 889 F.3d 273, 291 (6th Cir. 2018); *Cordova v. Baca*, 346 F.3d 924, 926-27 (9th Cir. 2003) (stating that "[b]ecause

the Supreme Court has not spoken to the consequences of a trial court's failure to give proper *Faretta* warnings, a state court would be entitled to conclude that a defective waiver colloquy does not automatically result in a defective waiver — that a defendant's waiver was nonetheless knowing and voluntary"); *see also United States v. McDowell*, 814 F.2d 245, 248-49 (6th Cir. 1987) (holding that the failure to give a prophylactic warning or conduct a particular inquiry alone does not require reversal if the record indicates that the defendant had the requisite knowledge); *United States v. Johnson*, 534 F.3d 690, 694 (7th Cir. 2008) (holding that court's failure to inform a defendant of the disadvantages of proceeding without a lawyer was "not fatal, for the ultimate question is not what was said or not said to the defendant but rather whether he in fact made a knowing and informed waiver of counsel"); *Jones*, 540 F.3d at 1293 (stating that the failure to give on-the-record warnings does not always lead to reversal because the warnings are not "an end in themselves" but a means of ensuring that defendants do not waive fundamental rights without an adequate understanding of the consequences).

As for the state court of appeals's specific holding, the Supreme Court has not addressed whether a criminal defendant may forfeit or waive by conduct the right to counsel. *Carruthers*, 889 F.3d at 290. The Supreme Court, however, has held that a criminal defendant can forfeit fundamental trial rights such as the right to be present at trial. *See Illinois v. Allen*, 397 U.S. 337, 343 (1970) (holding that a defendant can lose the right to be present at trial by being disruptive despite trial court's warnings regarding such conduct); *Taylor v. United States*, 414 U.S. 17, 20 (1973) (affirming the trial judge's decision to proceed with trial when the defendant failed to return to the courtroom following a recess). The Sixth Circuit (and other federal courts) has held that a defendant can forfeit or waive by conduct the right to counsel. *See United States v. Coles*, 695

F.3d 559, 560-62 (6th Cir. 2012) (holding that a defendant may lose the right to counsel by firing multiple attorneys); *King v. Bobby*, 433 F.3d 483, 492 (6th Cir. 2006) (holding that the petitioner chose to represent himself by rejecting the trial court's other options of proceeding with current counsel or hiring new counsel); *United States v. Green*, 388 F.3d 918, 921-22 (6th Cir. 2004) (holding that the defendant's "persistent, unreasonable demand for dismissal of counsel and appointment of new counsel" was a valid waiver of the right to counsel); *see also Sullivan v. Pitcher*, 82 F. App'x 162, 165-66 (6th Cir. 2003) (recognizing that other courts "have not hesitated" to find waiver through conduct).

The factual record in this case easily supports the Michigan Court of Appeals's determination that Nieman's continued and baseless requests for a fifth appointed attorney, his unreasonable attacks on existing counsel's representation, and his failure to retain his own attorney despite having ample time to do so constituted a forfeiture or waiver by conduct of his right to counsel during the part of trial in which he represented himself.

The state courts reasonably concluded that Nieman's rights to legal representation under the Sixth Amendment were not abridged.

## B.

Nieman argues next that his rights under the Due Process Clause were violated by the prosecutor, who engaged in misconduct. The challenged actions were prosecutor Steven Fox expressing a personal belief in his guilt of the crime when he argued that Nieman "murdered his father by strangulation" and responding to an argument that Nieman had come to another person's aid by stating that "saving a life after taking one doesn't make one equal."

The Michigan Court of Appeals found that Fox's remarks were improper but harmless. The first remark came during the examination of defense witness Randy Nieman by the petitioner when he was representing himself.   The petitioner wanted to pursue a line of questioning dealing with his contention that the funeral home did not embalm his father's body despite his instructions to do so.   The trial court had deemed that issue irrelevant, but the petitioner persisted in that questioning when he called his other brother, Thomas, to testify.   Fox then objected, stating, "Despite my continued objection, sustaining it, none of this line of questioning is relevant to how his father was buried after the Defendant murdered his father by manual strangulation."   *Nieman*, 2019 WL 1746211 at *8.   The next instance occurred when the petitioner wanted to testify that he had saved the life of a fellow inmate, apparently in an effort to prove his good character. Objecting, Fox gratuitously exclaimed, "Saving a life after you have taken one doesn't make one equal."   *Id.* at *9.   The court of appeals held that Fox's first remark "was plainly inappropriate and flagrant misconduct," and the second was "completely inappropriate."   *Id.* at *8, *9.   But the court held that Nieman did not show prejudice and the evidence against him was overwhelming. *Ibid.*

A prosecutor's misconduct will require habeas corpus relief when the conduct complained of "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"   *Parker v. Matthews*, 567 U.S. 37, 45 (2012) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), and calling *Darden* the "clearly established Federal law" on the issue).   *Parker* notes that "the *Darden* standard is a very general one," which permits state courts "more leeway . . . in reaching outcomes in case-by-case determinations[.]"   *Id.* at 48 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).   On habeas review, the AEDPA raises the bar even higher

- 17 -

than the "high standard" set by *Darden. Halvorsen v. White*, 746 F. App'x 489, 499 (6th Cir. 2018) (citing *Parker*, 567 U.S. at 48). To obtain habeas relief, "[t]he misconduct must so clearly violate *Darden* that the state court's failure to identify it was not just erroneous, but 'objectively unreasonable.'" *Id.* at 497 (citing *Williams*, 529 U.S. at 409). *Darden* itself did not find unconstitutional a prosecutor's characterization of the defendant as an "animal" or his expressed wish that he "could see [the defendant] with no face, blown away by a shotgun." *Darden*, 477 U.S. at 180, nn.11, 12. Even where prosecutors' statements are so extreme as to be "universally condemned," the inquiry remains whether due process was denied. *Id.* at 181.

A prosecutor's expression of his opinion on a defendant's guilt or a witness's credibility falls plainly in forbidden territory. *United States v. Young*, 470 U.S. 1, 9-10 (1985); *Hodge v. Hurley*, 426 F.3d 368, 378 (6th Cir. 2005). Such statements can convey the impression that the prosecutor has information not presented to the jury which supports the charges against the defendant thereby infringing upon the defendant's right to be judged solely on the evidence presented. What's more, the prosecutor's opinion carries with it the imprimatur of the government and may induce the jury to trust the government's judgment rather than its own. *Young*, 470 U.S. at 18-19; *Cristini v. McKee*, 526 F.3d 888, 901 (6th Cir. 2008); *see also Wilson v. Bell*, 368 F. App'x 627, 633 (6th Cir. 2010) (citing cases).

The state court of appeals correctly condemned the prosecutor's improvident remarks, but, as noted, found no prejudice to Nieman. That decision does not misapply or contravene applicable federal law. Fair minded jurists could conclude that the prosecutor's remarks were brief, the trial court admonished him after he made the first one, and the trial court instructed the jury that the attorneys' comments were not evidence. The trial court also instructed the jury on

the presumption of innocence, reasonable doubt, the burden of proof, and the proper consideration of the evidence.   Trial Tr. (May 24, 2017), ECF No. 14-23, PageID.1450-1454.   It is reasonable to conclude that those instructions mitigated any potential prejudice to Nieman.   *See*, *e.g.*, *Hamblin v. Mitchell*, 354 F.3d 482, 495 (6th Cir. 2003); *Knapp v. White*, 296 F. Supp. 2d 766, 776 (E.D. Mich. 2003).   Jurors are presumed to follow the court's instructions.   *Penry v. Johnson*, 532 U.S. 782, 799 (2001) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)); *United States v. Powell*, 469 U.S. 57, 66 (1984) ("Jurors . . . take an oath to follow the law as charged, and they are expected to follow it.").   Nieman has not established that prosecutor Fox's remarks, although improper, rendered his trial fundamentally unfair.   He is not entitled to a writ of habeas corpus on this ground.

C.

Next, Nieman argues that his rights under the Double Jeopardy Clause were violated because he was convicted of both first-degree premeditated murder and first-degree felony murder based upon a single death.   That claim is moot.   The Michigan Court of Appeals agreed with Nieman's identical argument on direct appeal and granted relief.   It vacated the conviction on one of the murder counts and upheld the other conviction based upon two alternate theories, and remanded the case to the trial court for the entry of an amended judgment reflecting one conviction and one sentence.   *Nieman*, 2019 WL 1746211 at *9.   Because the court's ruling "fully vindicated" the petitioner's double jeopardy rights, *see Jones v. Thomas*, 491 U.S. 376, 382 (1989), the claim is moot, since "there is no effective relief available in federal court that [Nieman] has not already received in state court," *Friedman's Inc. v. Dunlap*, 290 F.3d 191, 197 (4th Cir. 2002).   Habeas relief is not warranted on this claim.

- 19 -

D.

Nieman also argues that the evidence presented at his trial was insufficient to support his first-degree murder conviction, mainly because there is no physical evidence linking him to the death or prior abuse of his father.   The Michigan Court of Appeals rejected this claim on direct appeal.   Summarizing the evidence, the court pointed out that the expert pathologists, including the defense expert, agreed that the properly conducted autopsy resulted in a conclusion of death by manual strangulation, which requires continuous pressure on the neck for three to five minutes; there was physical evidence of the decedent's struggle; the petitioner was the sole other occupant of the house at the time of death and there was no evidence of a break-in; the police observed that the petitioner's right hand was swollen, there was a scratch on his forearm, and an indentation on his palm; neighbors heard arguments and evidence of abuse, which ceased the day before the petitioner called to report the death; the petitioner wanted to develop some property that the decedent owned but would not (or could not because of dementia) convey to the petitioner; and the petitioner concocted a presumably false explanation for the decedent's injuries.   *Nieman*, 2019 WL 1746211 at *9-11.   Based on those facts, the court concluded that a jury reasonably could find all the elements of the crime beyond a reasonable doubt.   *Ibid.*

That decision faithfully applied federal law, and it was not an unreasonable determination of the facts.   It is well established that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).   Under the Due Process Clause, the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is "whether the record evidence could reasonably support a finding of guilt

- 20 -

beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). A federal court reviewing a state court conviction under the habeas corpus statute that is "faced with a record of historical facts that supports conflicting inferences must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Cavazos v. Smith*, 565 U.S. 1, 7 (2011).

On direct appeal, review of a sufficiency of the evidence challenge must focus on whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. For habeas corpus, that rubric "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law," *id.* at 324 n.16, and through the framework of 28 U.S.C. § 2254(d), *Martin v. Mitchell*, 280 F.3d 594, 617 (6th Cir. 2002). The Sixth Circuit reads those cases as creating a gauntlet for state prisoners asserting a sufficiency-of-evidence challenge under the AEDPA: they must penetrate "two layers of deference to groups who might view facts differently" than a reviewing court on habeas review — the factfinder at trial and the state court on appellate review. *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009).

In a habeas case, the *Jackson* "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n.16. The jury found Nieman guilty of first-degree premeditated murder. Under Michigan law, first-degree premeditated murder requires proof that the defendant intentionally killed the victim and that the killing was premeditated and deliberate. Mich. Comp. Laws § 750.316; *People v. Oros*, 502 Mich. 229, 240, 917 N.W.2d 559, 565 (2018). "To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or

problem." *People v. Morrin*, 31 Mich. App. 301, 329, 187 N.W.2d 434, 449 (1971).   Under Michigan law, although the minimum time required to premeditate "is incapable of exact determination, the interval between initial thought and ultimate action should be long enough to afford a reasonable man time to subject the nature of his response to a 'second look.'" *People v. Vail*, 393 Mich. 460, 469, 227 N.W.2d 535, 538 (1975), *overruled on other grounds by People v. Graves*, 458 Mich. 476, 581 N.W.2d 229 (1998).   The Michigan Supreme Court has held that "an interval of time between the initial homicidal thought and ultimate action" is enough to prove "[p]remeditation and deliberation." *Oros*, 502 Mich. at 242, 917 N.W.2d at 566.   There must be evidence of "some time span between the initial homicidal intent and ultimate action," but it is for the jury "to determine whether there was sufficient time for a reasonable person to subject his or her action to a second look." *Ibid.* (quotation marks and citation omitted).   And that time span may be "only a brief moment of thought or a matter of seconds." *Id.* at 243, 917 N.W.2d at 566 (quotation marks and citation omitted).   Premeditation and deliberation may be established by evidence showing "(1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide." *People v. Schollaert*, 194 Mich. App. 158, 170, 486 N.W.2d 312, 318 (1992); *see also People v. Abraham*, 234 Mich. App. 640, 656, 599 N.W.2d 736, 745 (1999).

The jury also found Nieman guilty for first-degree felony murder.   Under Michigan law, a person who commits murder during the perpetration of a felony is guilty of first-degree murder. Mich. Comp. Laws § 750.316.   The elements of this brand of first-degree murder are the same as with the premeditation variety, except that instead of premeditation and deliberation, the state must prove that the defendant committed murder while committing, attempting to commit, or assisting

- 22 -

in the commission of any of the felonies specifically enumerated in the statute.  *See Matthews*, 319 F.3d at 789 (citing *People v. Carines*, 460 Mich. 750, 759, 597 N.W.2d 130, 136 (1999)).

Vulnerable adult abuse in the first or second degree under Michigan Compiled Laws § 750.145n is one of the enumerated felonies.  "A caregiver is guilty of vulnerable adult abuse in the first degree if the caregiver intentionally causes serious physical harm or serious mental harm to a vulnerable adult."  Mich. Comp. Laws § 750.145n(1).  "A caregiver is guilty of vulnerable adult abuse in the second degree if the reckless act or reckless failure to act of the caregiver or other person with authority over the vulnerable adult causes serious physical harm or serious mental harm to a vulnerable adult."  Mich. Comp. Laws § 750.145n(2).  To establish such offenses, the prosecution must show that the defendant intentionally caused serious physical harm or serious mental harm to the vulnerable adult.  *People v. Comella*, 296 Mich. App. 643, 650, 823 N.W.2d 138, 141-42 (2012).  "'Serious physical harm' means a physical injury that threatens the life of a vulnerable adult, that causes substantial bodily disfigurement, or that seriously impairs the functioning or well-being of the vulnerable adult."  Mich. Comp. Laws § 750.145m(r).  "'Serious mental harm' means a mental injury that results in a substantial alteration of mental functioning that is manifested in a visibly demonstrable manner."  Mich. Comp. Laws § 750.145m(s).  Of course, in addition to the intent to commit the underlying felony, the prosecution must establish the requisite intent to commit murder.

Lastly, as with any crime, the prosecution must prove beyond a reasonable doubt that the defendant committed the charged offense.  *People v. Oliphant*, 399 Mich. 472, 489, 250 N.W.2d 443, 449 (1976); *People v. Yost*, 278 Mich. App. 341, 356, 749 N.W.2d 753, 767 (2008).  Direct or circumstantial evidence and reasonable inferences arising from that evidence may constitute

satisfactory proof of the elements of an offense, *People v. Nowack*, 462 Mich. 392, 400, 614 N.W.2d 78, 81 (2000); *People v. Jolly*, 442 Mich. 458, 466, 502 N.W.2d 177, 180 (1993), including the identity of the perpetrator, *Dell v. Straub*, 194 F. Supp. 2d 629, 648 (E.D. Mich. 2002), and intent or state of mind, *People v. Dumas*, 454 Mich. 390, 398, 563 N.W.2d 31, 34 (1997).

The record in this case shows that the prosecution presented sufficient evidence to support Nieman's first-degree murder conviction under either theory.   The victim's injuries and manner of death and testimony about Nieman's abusive treatment of his father supported a finding that Nieman intentionally killed his father and did so with premeditation and deliberation.   The evidence also supported a finding that Nieman committed first- and second-degree vulnerable adult abuse.   The medical examiner testified that the victim had neck bruises, contusions, scratches, and a fractured hyoid, and that he died from manual strangulation, which would take three to five minutes to cause death, and that the death was a homicide.   Trial Tr. (May 19, 2017), ECF No. 14-21, PageID.989-95, 1009.   Neighbors testified that they often heard Nieman cursing and screaming at his father and that they heard banging, smacking sounds, and moaning coming from the house.   One neighbor even testified that she heard Nieman threaten to kill his father. Trial Tr. (May 18, 2017), ECF No. 14-20, PageID.814-15, 823, 831-35, 844-46.   Neighbors and family testified that the victim was elderly and had dementia and that Nieman lived with his father and was his caregiver and guardian.   *Id*. at PageID.772, 775-78.   Nieman's brother also testified that the victim's appearance deteriorated over time and that Nieman refused to take him to the hospital because he had bruises that might be viewed as suspicious.   *Id*. at PageID.779, 784-87.

Police officers testified that Nieman was at the house with the victim when they responded to the 911 call, that the victim was lying in an unusual position on a bedroom chair with visible

- 24 -

face and neck injuries, and that there was no evidence of a fall or that anyone had broken into the house or was present when the victim died.   Trial Tr. (May 19, 2017), ECF No. 14-21, PageID.896-98, 907, 911, 914-15.   A police officer also testified that Nieman's right hand was swollen with bruising on the knuckles and broken skin on the palm.   *Id*. at PageID.918-19.   This direct and circumstantial evidence was more than sufficient to support the first-degree murder conviction under both theories.

Nieman disputes the jury's evaluation of the evidence presented at trial.   But it is the job of the fact-finder at trial, not a federal habeas court, to resolve evidentiary conflicts.   *Jackson*, 443 U.S. at 326 ("A federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."); *Martin*, 280 F.3d at 618.   The jury's verdict was reasonable.   The evidence presented at trial, viewed in a light favorable to the prosecution, established beyond a reasonable doubt that Nieman committed first-degree murder.   Habeas relief is not warranted on this claim.

E.

Nieman's fifth claim is that his trial attorney perjured himself during the proceedings and appellate counsel refused to raise the issue on appeal.   I view this argument as a claim of ineffective assistance of trial and appellate counsel.   Nieman did not raise it in the state courts.

A federal habeas petitioner asserting a violation of his Sixth Amendment right to the effective assistance of counsel must show that counsel's performance was deficient, and that the deficiency prejudiced the defense.   *Strickland v. Washington*, 466 U.S. 668, 687 (1984).   An attorney's performance is deficient if "counsel's representation fell below an objective standard of

reasonableness." *Id.* at 688.   The petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.   "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689.   The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that 'the proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688).   And where the challenged conduct amounts to legitimate trial strategy, habeas courts will not find that counsel performed deficiently.  *Robins v. Fortner*, 698 F.3d 317, 337-38 (6th Cir. 2012).

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.   Unless a defendant demonstrates both deficient performance and prejudice, "it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

Success  on  ineffective-assistance-of-counsel  claims  is  relatively  rare  because the *Strickland* standard  is  "difficult  to  meet." *White*,  572  U.S.  at  419  (quoting *Metrish v. Lancaster*,  569  U.S.  351,  357-58  (2013)).   Under AEDPA, obtaining relief under *Strickland* is even  more  challenging  because  "[t]he  standards  created  by *Strickland* and § 2254(d) are both highly  deferential and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (internal citations and quotation marks omitted).   This doubly-deferential standard requires

the Court to give "both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013). "[T]he question is not whether counsel's actions were reasonable," but whether "there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

Nieman accuses attorney Kosmala of "perjuring" himself, lying about his intentions at trial, and being otherwise deficient during his criminal proceedings, but he does not identify any record facts to back up those contentions. Conclusory allegations, without evidentiary support, are insufficient to justify habeas relief. *See Workman v. Bell*, 178 F.3d 759, 771 (6th Cir. 1998) (conclusory allegations of ineffective assistance of counsel do not justify federal habeas relief); *see also Wogenstahl v. Mitchell*, 668 F.3d 307, 335-36 (6th Cir. 2012) (citing *Workman* and denying habeas relief on conclusory claims); *Washington v. Renico*, 455 F.3d 722, 733 (6th Cir. 2006) ("bald assertions and conclusory allegations" do not provide sufficient basis for an evidentiary hearing on habeas review). Nieman has not established that his trial attorney was ineffective.

Nieman also says that his appellate counsel was ineffective, but this claim fares no better. It is true that the Sixth Amendment guarantees a defendant the right to the effective assistance of appellate counsel. *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985); *Halbert v. Michigan*, 545 U.S. 605, 609-10 (2005). But court appointed appellate counsel does not have a constitutional duty to raise every non-frivolous issue requested by a defendant. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). A habeas court reviewing an ineffective-assistance-of-appellate-counsel claim must defer twice: first to appellate counsel's decision not to raise an issue, and secondly, to the state court's

determination that appellate counsel was not ineffective.  *Woods v. Etherton*, 578 U.S. 113, 119 (2016) (per curiam).

Nieman's main argument is that his appellate attorney did not raise an ineffective-assistance-of-trial-counsel argument on appeal.  Because there is no merit to that alleged trial error, appellate counsel cannot be faulted for not raising it.  *Moore v. Mitchell*, 708 F.3d 760, 776 (6th Cir. 2013); *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013) ("Omitting meritless arguments is neither professionally unreasonable nor prejudicial.").  Moreover, Nieman's appellate attorney raised substantial issues on direct appeal including claims concerning the trial court's denial of substitute counsel and Nieman's self-representation, the conduct of the prosecutor, and the sufficiency of the evidence, as well as a successful double jeopardy claim.  Nieman has not shown that appellate counsel's strategic decisions fell outside the wide range of professionally competent assistance.  Habeas relief will not be granted on this claim.  *See Hand v. Houk*, 871 F.3d 390, 411 (6th Cir. 2017).

III.

None of the petitioner's claims presents a basis to issue a writ of habeas corpus under 28 U.S.C. § 2254(d).  The state courts' decisions in this case were not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts.  The petitioner has not established that he is presently in custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:    January 30, 2024